Stanley S. Hershey and Ruth Hershey v. Commissioner.
Hershey v. Commissioner
Docket No. 80635.
United States Tax Court
T.C. Memo 1962-277; 1962 Tax Ct. Memo LEXIS 31; 21 T.C.M. (CCH) 1458; T.C.M. (RIA) 62277; November 23, 1962
Bernard B. Laven, Esq., 530 W. 6th St., Los Angeles, Calif., for the petitioners. Alfred L. Margolis, Esq., and J. Earl Gardner, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in *32 petitioners' income taxes and additions to the tax for the years 1950, 1951, and 1952 in the following amounts: Additions to tax
Section
Section
Section
293(b)
294(d)(1)(A)
294(d)(2)
Year
Deficiency
I.R.C., 1939
I.R.C., 1939
I.R.C., 1939
1950
$ 1,029.58
$ 514.79
$97.21
$ 64.81
1951
42,601.24
21,300.62
2,569.88
1952
57,627.66
28,813.83
3,521.91
$101,258.48
$50,629.24
$97.21
$6,156.60
Respondent concedes that he is in error in the assertion of the addition to the tax in the amount of $64.81 under section 294(d)(2) of the Internal Revenue Code of 1939 for the year 1950. The issues for decision are: (1) Whether petitioners for the years 1950, 1951, and 1952 filed false and fraudulent returns with intent to evade income tax. (2) Whether petitioners had unreported net business income from the scrap metal business in the years 1950, 1951, and 1952 in the respective amounts of $6,221.42, $82,036.95, and $91,840.63 or any part thereof. (3) Whether petitioners are liable for the addition to tax provided in section 294(d)(1)(A) of the Internal Revenue Code of 1939 for the year 1950 and the addition to tax provided *33 in section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1951 and 1952. Findings of Fact The stipulation of facts which identifies some of the exhibits is incorporated herein by this reference. Petitioners, Stanley S. Hershey and Ruth Hershey, husband and wife, filed joint Federal income tax returns for the years 1950, 1951, and 1952 with the district director of internal revenue at Los Angeles, California. During part of 1950 and for some time prior thereto, Stanley S. Hershey (hereinafter referred to as petitioner) worked as a taxicab driver, employed by the Yellow Cab Company of California, and during a part of 1950 he also worked as an employee of the U-Paint Furniture Company. In the fall of 1950 petitioner began a business of collecting scrap metals and selling it to large scrap dealers. During the years 1951 and 1952 petitioner continued his business of collecting and selling scrap metals. Petitioners on their original 1950 income tax return reported total wages received from U-Paint Furniture Company and Yellow Cab Company of California in the amount of $1,331.49 and tips of 10 percent of wages from the Yellow Cab Company in the amount of $71.65. *34 They reported as gross receipts from the scrap iron and metals business the amount of $1,997.23 and net profits on that business of $1,115.23. This return was prepared for petitioners by a public accountant who also prepared petitioners' 1951 and 1952 original Federal income tax returns. This accountant's wife was a cousin of petitioner's wife. The amount labeled on petitioners' 1950 return as "Gross Receipts" was so labeled by the accountant who derived the amount by subtracting from what he computed as the amount received by petitioner in payment for scrap metals, the amount he computed as the cost to petitioner of those metals, and, therefore, this amount should more properly have been labeled "Gross Profits." On their original Federal income tax return for the year 1951 petitioners reported gross receipts from sales of scrap iron and metals in the amount of $38,673.41, cost of sales of scrap iron and metals of $32,274, gross profit on sales of scrap iron and metals of $6,399.41, commissions earned due to sale of materials on exclusive sales arrangement of $3,048.60, total gross income of $9,448.01, operating expenses of $4,218.50, and net income from business of $5,229.51. *35 On their original Federal income tax return for the year 1952 petitioners reported gross receipts from sales of scrap iron and metals of $107,290.24, cost of sales of $92,621.95, gross profit of $14,668.29, commissions earned (cost of sales refund on exclusive materials sales arrangement) of $11,270.64, total gross income of $25,938.93, total operating expenses of $16,209.01, net operating income of $9,729.92, income from rubbish hauling of $1,950, total income from business of $11,679.92, gross salary from California Duplicating Company, Los Angeles, California, of $5,700 less commissions paid to Sophie Levin of $2,850, with a resulting net total wages from California Duplicating Company of $2,850, making a total net income of $14,529.92. On each of the original Federal income tax returns for the years 1950, 1951, and 1952, petitioner showed his occupation as "Scrap Iron." Petitioners did not show the accountant who prepared their original 1950, 1951, and 1952 income tax returns any regular books of account of their business operation. Petitioner provided this accountant with some weight slips and adding machine tapes, some cancelled checks and miscellaneous memoranda from which *36 to prepare each of these returns. At the time of preparing the tax return for the year 1950 the accountant asked petitioner if he had books of account and petitioner replied that there were none, and in reply to the accountant's suggestion that petitioner should keep books and records of his business, which the accountant suggested that he would set up, petitioner said that he did not desire to have this done. Sometime in the latter part of 1953, after an investigation by the Internal Revenue Service of petitioners' income tax returns for the years 1950, 1951, and 1952 had been commenced, petitioner and the accountant who had prepared the original returns for these years called upon the accountant's father who was a certified public accountant admitted to practice before the Treasury Department, requesting that he take over and prepare amended returns for petitioners. The certified public accountant discussed with petitioner what he considered to be the position of the Internal Revenue Service on voluntary disclosure. Petitioner stated to the certified public accountant that there was undisclosed income in the original returns. The certified public accountant inquired of petitioner *37 whether he had books and records. Petitioner replied that he had none. The certified public accountant ascertained from petitioner that his sales were made to Alpert and Alpert Iron & Metal Company (hereinafter referred to as Alpert) and received permission from petitioner to visit the offices of Alpert and make lists of the sales or weight slips which he found there. The certified public accountant asked petitioner if he had done business under a name other than his own and petitioner replied that he had used the name of H. Jackson. The certified public accountant visited Alpert and made an analysis of weight slips. He then suggested to petitioner that since he had no books and records, cost of the goods sold might be obtained by going to petitioner's several sources of supply of the scrap metals and determining from their records the amount that petitioner had paid to them for such scrap metals. The certified public accountant requested permission from petitioner to go to his various suppliers, but petitioner told him not to go to these sources since if he did so, petitioner would lose the sources of supply, which he was in no position to do. Petitioner told the certified public *38 accountant that he received approximately 2 cents a pound profit from scrap metals and showed the accountant an agreement between him and National Tapered Wings, Inc., in the form of a letter to petitioner by that company, acknowledged and agreed to by petitioner. This letter dated December 19, 1952, states: Reference is made to our letter of Agreement dated May 30, 1952 concerning maintenance and transportation services to be performed by your organization at our Plant No. 1, 3001 E. 11th Street, Los Angeles 23, California. Since our Plant No. 2 is now in operation at 4906 Alcoa Avenue, Vernon, it is proposed that your organization extend the same maintenance and transportation services, as in the past, to the new Vernon facility, and under the same general terms and conditions as our prior letter of Agreement. However, since it is now recognized that the volume of aluminum scrap generated (both plants combined), will constitute a recovery factor of definite value over and above accumulation, segregation, and transportation expenses, it is proposed that provisions be initiated to isolate aluminum scrap produced from that of other metals; and that such aluminum scrap be cleaned, *39 weighed and sold for our account at the going-market rate of record for such aluminum scrap, and that we be reimbursed in the amount of such sales, less a handling allowance in the amount of 2 cents per lb. On this basis, we will require a sales receipt for each transaction, evidencing certified weight, etc., for our files, together with the covering remittances in each case. It is further proposed that the aforementioned handling charge of 2 cents per lb. be considered applicable to the sale of aluminum scrap only and shall be considered as a fee over and above the established maintenance charge of $12.50 per working day as negotiated under our prior agreement dated May 30, 1952. Your acceptance of this proposed Amendment to our prior Agreement is respectfully requested. We are most sincerely appreciative of the excellent services which have been offered by your people in the past and trust that conditions will permit the continuance of such assistance throughout the coming year. From this letter and petitioner's statement as to the profit received by him, the certified public accountant concluded that petitioner received a 2 cents a pound profit. He determined from the weight *40 slips examined that petitioner's average sales price of scrap metals was 7 cents a pound. This accountant then decided that he would use a ratio, for determining cost of goods sold, to be used in the amended returns of five-sevenths of the sales price which he had computed. The certified public accountant prepared amended Federal income tax returns of petitioner's income for the years 1950, 1951, and 1952. These returns were shown to petitioner, signed by petitioners, and filed with the district director of internal revenue at Los Angeles, California on January 12, 1954. In the amended return for 1950 the salaries paid by Yellow Cab Company of California and U-Paint Furniture Company to petitioner were the same as reported in the original 1950 return, and the amount of tips received was the same. The amended return for 1950 showed, under income from scrap business, gross receipts from Alpert of $6,503.62. On a handwritten schedule attached appeared the notation, "Alpert and Alpert (Frances Brody)" and two columns of figures, each under the title "S. Hershey", the first having figures after dates ranging from August 29, 1950, through November 29, 1950, totaling $4,120.62, and the *41 second, figures opposite dates from December 5, 1950, through December 29, 1950, totaling $2,383, producing a total for the two columns of $6,503.62. This return showed cost of sales as five-sevenths of receipts which resulted in the amount of $4,645.44 leaving a gross profit of $1,858.18. This return showed total business expenses of $894 and net income of $2,367.32. The amended return for 1951 showed gross receipts from scrap business in the amount of $111,276.83 listed as gross receipts from Alpert, S. Hershey $43,708.69, and H. Jackson $67,568.14; cost of sales, five-sevenths of receipts, of $79,483.45; gross profit of $31,793.38; and net income of $27,574.88. This return also had attached handwritten sheets showing dates and amounts of payments, one schedule being headed "S. Hershey" and the other "H. Jackson," each schedule totaling the amount of receipts under the respective name shown on the amended return. The amended return for 1952 showed gross receipts from Alpert in the amount of $172,561.78 divided under S. Hershey $117,151.95, and H. Jackson $55,409.83, cost of sales (five-sevenths of receipts) in the amount of $123,258.41, gross profit of $49,303.37, expenses of *42 $16,209.01, net operating income of $33,094.36, income from rubbish hauling of $1,950, and income from salary from California Duplicating Company, Inc., the same as reported in the original return making a total income of $37,894.36. This amended return also had attached handwritten schedules with dates and amounts under the name of "S. Hershey in a/c with Alpert & Alpert" and "H. Jackson in a/c with Alpert & Alpert." On November 30, 1953, petitioner swore to the following statement: I Stanley S. Hershey solemnley swear that the statements set forth below are true and correct. 1. As of Dec. 31, 1952 to the best of my knowledge and belief had about 2 hundred dollars. 2. The cost and expenses of operating the S. S. Hershey Co. which is my solely owned junk business is to my belief correctly set forth upon my income tax returns as filed for the years 1950, 1951, 1952 and there are no additional expenses that I have failed to include thereon. 3. I have never transacted any business under any fictitious names or acted as agent for any one else in the collection of monies. On October 29, 1957, petitioner was convicted, upon his plea of nolo contendere, in the United States District *43 Court for the Southern District of California of the offense of making a false and fraudulent income tax return for himself and wife for the year 1951, making a false and fraudulent affidavit relating to doing business under a fictitious name in violation of 26 USC 145(b) and 18 USC 1001, and sentence was imposed. During the course of the investigation of his income tax returns for 1950, 1951, and 1952 petitioner stated to the examining agents of the Internal Revenue Service that he had never sold scrap metals to anyone other than Alpert. Petitioner sold scrap metals to Golden West Salvage Company in the years 1950 and 1951 in the respective amounts of $1,218.02 and $484.86. During the years here in issue petitioner owned two trucks with which he picked up scrap metals from approximately nine places, and, except for relatively small amounts of such metals delivered in 1950 and 1951 to Golden West Salvage Company, delivered the metals to the yard of Alpert. Most of the metal which petitioner delivered to Alpert was aluminum scrap but he did deliver some other metals such as cast iron. When one of petitioner's trucks arrived at the Alpert *44 yard it was weighed on a large truck scale as it entered the yard and was again weighed on this scale when it left the yard and the difference in these weights was considered to be the weight of the scrap metals delivered in that truck. Commencing about the first of March 1951 the weighing of the trucks was done at times by Frances Brody (hereinafter referred to as Brody) who during the years here involved was office manager of Alpert, but generally this weighing was done by another employee of Alpert. A weight slip would be made out at the time the truck was weighed by Brody or the other employee of Alpert who weighed the trucks showing the date, the name S. Hershey, the kind of metal delivered, and the number of pounds of metal delivered. Petitioner was usually in the office of Alpert during 1951 and 1952 at least once each day and sometimes more often and at times would look at these weight slips. However, the weight slips during the years 1951 and 1952 would be accumulated for a period of approximately 10 days without payment. When petitioner came to Alpert's office during the period from March 1951 throughout 1952 for a settlement of the accumulated weight slips, he generally *45 dealt with Brody. She would bring out all the slips on which payment had not been made, and petitioner and Brody would check together the original weight slips, and petitioner would decide which ones he wanted rewritten and the weight slips would be rewritten as petitioner instructed, generally by Brody. Some of the slips would be rewritten to place a portion of the poundage to be paid for on slips in the name of S. Hershey and the balance of such poundage would be placed on slips written in the name of H. Jackson. The name of a supplier designated by petitioner would be written on many of the new weight slips in the name of S. Hershey, but no supplier's name was written on the Jackson slips. It was not the custom in the scrap metal business to use a fictitious business name. In some instances, particularly with respect to aluminum borings, where a weight slip was rewritten, a part of the poundages delivered would be listed on the S. Hershey slip at a price of from 1 to 1 1/2 cents per pound under the price which petitioner was to receive from Alpert for the metal and a portion of the poundage would be listed on the slip under the name of H. Jackson, either at the full price to be *46 received for the metal or the lesser price. Then a third slip under the name of H. Jackson would be written listing a poundage of metal of a type not actually delivered to Alpert by petitioner in a total amount equal to that listed on the other slips at a price less than the price to be received by petitioner at a price of 1 cent or 1 1/2 cents per pound, or a slip showing "price adjustment" of this amount per pound under either the name of S. Hershey or H. Jackson would be written to bring the actual price of the metal listed on the S. Hershey slip or the combined S. Hershey and H. Jackson slips to the actual price to be paid to petitioner. During 1951 and part of 1952 the price shown on the slips which listed the metals actually delivered would be the OPS allowed price without consideration of quantity bonuses allowed under OPS regulations. While there was some variation in the method of rewriting the slips, this was the general procedure followed in 1951 and 1952. After the writing of the new weight slips was completed, the original slips would be destroyed promptly by petitioner, or by Brody. No original weight slips were left understroyed. The new weight slips were written in *47 duplicate, one copy given to Hershey, and the other kept by Brody for Alpert's records. Hershey, while still in Alpert's office, destroyed his copy of the new slips bearing the name, "H. Jackson," but left Alpert's office with the rewritten copy of the weight slips bearing the name, "S. Hershey." Petitioner was paid by checks or credit to his loan accounts with Alpert for the amounts shown as due him on the Hershey weight slips and was paid by cash or credit to his loan accounts with the amounts shown on the Jackson weight slips. The total amounts received by petitioner from Alpert as reflected on the weight slips as rewritten under the names of S. Hershey and H. Jackson were as follows in the years 1951 and 1952: 1951
1952
S. Hershey
$ 44,345.42
$119,764.84
H. Jackson
70,942.54
65,521.31
Total
$115,287.96
$185,286.15
The first weight slip in the records of Alpert in the name of H. Jackson is dated in January 1951. This slip was not written or paid by Brody. From August 20, 1950, until February 20, 1951, Brody was away from Alpert's office on a trip. She had no dealings with petitioner prior to February 20, 1951. Shortly after she returned to work *48 on February 20, 1951, she was informed by one of the Alperts who was a partner in the business that weight slips were being rewritten for petitioner and that some of the rewritten slips were under the name, "S. Hershey" and others under the name, "H. Jackson." Brody is now, and has been for a number of years, a partner in Alpert, but during the years 1950 through 1952 she was not a partner but only an employee. She had been employed by Alpert from 1930. At the time she was first employed by Alpert she was a bookkeeper and has since that time done work involving at least in part the keeping of Alpert's books. National Tapered Wings, Inc., was one of petitioner's sources of supply of scrap metals in 1951 and 1952. Under date of May 30, 1952, that company, by Frank E. Hooykaas, its vice president, wrote a letter to petitioner, acknowledged and agreed to by petitioner, which stated as follows: This letter will serve to confirm our recent discussion, at which time it was agreed that your organization will, for a fee of $12.50 per work-day (not to exceed a total of $325.00 per month) perform the following maintenance and transportation services as required, until further notice: Clean-up *49 and maintenance of all yard and parking areas, including accumulation, removal and/or disposal of all surplus wood, papers, tubing, scrap-metals, used oils or other fluids and other refuse; and including the occasional temporary use of your trucks, by appointment arrangements, for transporting within the Los Angeles area, either incoming raw materials or out-going finished machine parts to or from our local customers during periods of overload in our own shipping department. It is further understood that your organization will provide the truck-driver as required and that necessary insurance covering both truck and driver will be carried by you. Your acceptance of this Agreement by acknowledgement hereto is respectfully requested. Prior to July 1, 1954, National Tapered Wings, Inc., kept no control over the amount of scrap which it generated and which was sold to petitioner but relied on the weight slips presented by petitioner as indicating the amount of scrap sold by it to petitioner. Hooykaas, vice president of National Tapered Wings, was associated with petitioner in a partnership which was dissolved in 1952 when its business was incorporated under the name, "California Duplicating *50 Company." The father of Frank E. Hooykaas owned a capital interest in the partnership and stock in the corporation. Sophie Levin, referred to on petitioner's income tax returns as receiving commissions from him in connection with the California Duplicating Company, was a sister of Frances Brody. On May 1, 1952, petitioner, Bert Johnson, and Frank A. Hooykaas, the father of Frank E. Hooykaas, entered into an agreement to dissolve the partnership of California Duplicating Company which then existed between them and to organize a corporation in which it was agreed that 37 1/2 percent of the stock would be purchased by each Frank A. Hooykaas and Johnson and 25 percent by petitioner. In April 1952 Brody advanced to petitioner $20,000. She obtained $10,000 of the amount advanced to petitioner from Alpert and entered the advance on Alpert's books as a loan to petitioner under date of April 28, 1952. A signature, "Sophie Levin" appears on a document which states: THIS AGREEMENT is entered into at Los Angeles, California, this… day of April, 1952, by and between S. S. HERSHEY, hereinafter referred to as "Hershey", and SOPHIE LEVIN, hereinafter referred to as "Mrs. Levin". WHEREIN *51 it is mutually agreed as follows: 1. Mrs. Levin hereby transfers to Hershey the sum of Twenty Thousand Dollars ($20,000.00) for the uses and purposes hereinafter set forth. 2. Hershey agrees to purchase in his own name from existing stockholders shares of stock of the California Duplicating Company, 3228 Union Pacific, Los Angeles, a California corporation, with the Twenty Thousand Dollars ($20,000.00) herein received, which shares of stock Hershey warrants will represent a twenty-five per cent (25%) interest in the said corporation. 3. Hershey agrees to hold fifty per cent (50%) of the said shares of stock purchased with the aforesaid Twenty Thousand Dollars ($20,000.00) in trust for Mrs. Levin. 4. Hershey acknowledges and agrees that the sum of Ten Thousand Dollars ($10,000.00) of the money received from Mrs. Levin represents a loan from her to him, and Hershey agrees to repay to Mrs. Levin the said sum of Ten Thousand Dollars ($10,000.00), without interest, within six months from the date hereof. 5. In consideration of the execution of this agreement, Hershey agrees to turn over and transfer to Mrs. Levin, immediately upon his receipt thereof, fifty per cent (50%) of all *52 income of every nature whatsoever which he receives from or through the stock purchased with the aforesaid Twenty Thousand Dollars ($20,000.00) whether said income be in the form of profits, dividends, emoluments, accumulations, distributions or any other form. Hershey further agrees to give to Mrs. Levin, upon receipt, fifty per cent (50%) of any assets of the California Duplicating Corp. received by him, whether such assets represent a distribution of capital assets to stockholders on dissolution or otherwise. 6. It is understood that immediately upon Hershey's purchase of stock giving him a twenty-five per cent (25%) interest in the California Duplicating Company, he will commence to receive a weekly compensation for services rendered on behalf of said company. In further consideration of the execution of this agreement, Hershey agrees to give to Mrs. Levin one-half (1/2) of all salary and/or other compensation received by him from the California Duplicating Company. IN WITNESS WHEREOF, the parties have caused this agreement to be executed the day and year first above written. The $10,000 loan to petitioner was repaid to Alpert by credits to the loan account on Alpert's *53 books from amounts shown as due to petitioner on either S. Hershey or H. Jackson weight slips. About 80 percent of the business of California Duplicating Company during the years here involved, both as a partnership and as a corporation, was doing subcontracting work for National Tapered Wings, Inc. The scrap metals generated from the work performed by California Duplicating Company for National Tapered Wings, Inc., were considered to belong to National Tapered Wings, Inc. Sometime in 1951 petitioner paid approximately $7,000 to place a blower to assist in collecting scrap metals from National Tapered Wings, Inc., at the plant of that company with the understanding that in some manner he would be reimbursed for this expenditure. Petitioner made payments to National Tapered Wings, Inc., for scrap metals throughout the year 1952 but the books of account of that company show no such payments listed as such after September 25, 1952. The payment to petitioner for the use of his trucks and rubbish hauling was made by some form of credit to the amounts which were due from petitioner to National Tapered Wings, Inc. Petitioner has continued from the years here involved until the date of *54 trial to haul scrap metals for National Tapered Wings, Inc., but the arrangements for his compensation for this work were changed as of July 1, 1954. On a ledger sheet in Alpert's records an account entitled, "Frank E. Hooykaas and S. Hershey (National Tapered Wings)" was set up on January 5, 1953, with a charge thereto of $25,000, which amount was shown to have credits against it discharging it in full by April 6, 1953. Bardwell & McAllister was another source of supply of scrap metals used by petitioner in 1951 and 1952. The records of this company showed that petitioner paid to it $732.29 for scrap metals in 1951 and $339.02 for scrap metals in 1952. The records for 1952 did not show a payment of $80.89 by check on March 25, 1952. A check under that date from petitioner to Bardwell & McAllister was deposited in the bank account of that company. Another of petitioner's sources of scrap meals in 1951 and 1952 was Aircraft Tapered Sheets. About December 10, 1951, petitioner negotiated a loan of $25,000 from Alpert and at his request Alpert's check for this amount was issued to Aircraft Tapered Sheets on December 10, 1951. This loan was repaid by credits thereto of amounts due *55 to petitioner from Alpert for scrap metals listed on weight slips under the name of either S. Hershey or H. Jackson and was completely repaid by April 28, 1952. About May 22, 1952, petitioner negotiated another loan of $25,000 from Alpert and at his request Alpert's check in this amount was issued to Aircraft Tapered Sheets on May 22, 1952. Petitioner gave Alpert his personal note for this $25,000 loan. This loan was repaid by credits similar to those made in repayment of the prior $25,000 loan and this loan had been completely repaid by October 17, 1952. In addition to the two $25,000 loans and the $10,000 loan in connection with the California Duplicating Company stock purchase, Alpert made other loans to petitioner which were repaid by credits of amounts shown as due petitioner on weight slips in the name of either S. Hershey or H. Jackson. The first of such loans by Alpert to petitioner was on April 17, 1951. There were produced at the trial by petitioner in response to respondent's subpoena two bound books, one marked "1951" and the other "1952" with entries therein on the bound pages mostly in ink, but sometimes in pencil. These books contained figures listed as receipts *56 and under the names of the various suppliers of scrap metals to petitioner showed weights, gross dollar amounts, and net dollar amounts with notations of "paid by check" followed by an amount, "paid by cash check" followed by an amount, and "paid by cash" followed by an amount. The gross dollar amounts of receipts shown in these books coincided substantially with the payments by Alpert by check to petitioner. Some checks drawn by petitioner payable to cash and cashed by officers of companies from which petitioner purchased scrap metals reconciled with entries in these books. Prior to the week before the trial of this case these books had not been shown to any agents of the Internal Revenue Service or to the representatives of respondent. These books had not been shown to petitioner's accountants who prepared the original returns or the amended returns for the years here involved. These books show as cost of goods sold in 1951 and 1952 the following: By Cash
Name of Vendor
By Check
Check
By Cash
Total
1951
Pasadena Air Products
$ 1,109.15
$ 809.33
$ 1,918.48
National Tapered Wings
2,807.00
$ 215.20
4,272.04
7,294.24
Aircraft Tapered Sheets
14,262.64
14,262.64
Taken by Alpert against loan
4,344.45
4,344.45
Com-Air Products, Inc.
1,128.64
1,680.90
2,809.54
Bardwell-McAllister
732.29
732.29
Paramount Engineering, Inc.
513.06
513.06
California Duplicating Co., Inc.
132.60
132.60
Aero-Machine
247.57
247.57
Aeromatic
66.25
66.25
Dix Manufacturing Company
0
0
Coast Spar Milling, Inc.
0
0
Totals
$25,211.05
$ 215.20
$ 6,894.87
$32,321.12
1952
Pasadena Air Products
$3,670.35
$ 2,268.70
$ 5,938.95
National Tapered Wings
$ 8,559.00
19,833.00
28,392.00
Aircraft Tapered Sheets
44,574.29
44,574.29
Com-Air Products, Inc.
3,533.25
609.25
4,142.50
Bardwell-McAllister
419.93
419.93
Paramount Engineering, Inc.
202.20
151.20
376.42
729.82
CaliforniaDuplicating Co., Inc.
$ 2,608.80
$ 2,608.80
Aero-Machine
$ 353.07
353.07
Mercury Engineering
1,397.03
1,397.03
Forge-Screw
170.76
170.76
Air-Ways
3,302.40
3,302.40
Dix Manufacturing Company
0
Coast Spar Milling
0
Totals
$57,812.50
$3,821.55
$30,395.50
$92,029.55
*57 By rewriting weight slips to show metals received that actually had not been delivered, Alpert's inventory was somewhat distorted and was not accurately kept as required by OPS. Alpert, during the time OPS regulations were in effect during 1951 and 1952, charged over OPS ceiling prices for meals sold to one of its customers. Brody knew that the showing on weight slips of metals not delivered caused a distortion in Alpert's inventory and of the prices over OPS ceiling charged to one customer. The cost of goods sold as shown in the statutory notice of deficiency was determined by respondent's agents from examining records of petitioner's suppliers. Petitioner told the examining agents of seven sources of scrap supply and the agents found nine. The cost of goods sold as computed by respondent's agents and used in the statutory notice of deficiency was $800.20 for 1950, $24,287.86 for 1951, and $71,401.58 for 1952. Petitioner's gross receipts from salvage sales to Alpert as used in the notice of deficiency were $7,800.83 for 1950, $115,287.96 for 1951, and $185,286.15 for 1952. Respondent, in his notice of deficiency, determined that petitioners had unreported business income in *58 the years 1950, 1951, and 1952 in the amounts of $6,221.42, $82,036.95, and $91,840.63 which was arrived at by adding to the receipts from sales to Alpert in 1950 and 1951, the receipts by petitioner from sales to Golden West Salvage Company and adding to receipts from the Alpert sales in 1952 the amount of $3,894.99 designated as other sales and in each year subtracting from the total sales, the total cost of goods sold as computed by respondent, the operating expenses as shown on petitioner's original returns, and the income from the scrap metal business as shown on petitioner's original returns. Respondent determined an addition to the tax under section 293(b) of the Internal Revenue Code of 1939 for each of the years here involved, an addition to the tax under both sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 for the year 1950, and additions to the tax for the years 1951 and 1952 under section 294(d)(2) of the Internal Revenue Code of 1939. Ultimate Facts Respondent has not established by clear and convincing evidence that petitioners' income tax return for the year 1950 was false and fraudulent. Petitioner has failed to show error in the deficiency *59 for 1950 as determined by respondent, and respondent has failed to show that any part of such deficiency is due to fraud with intent to evade tax. Petitioners filed false and fraudulent income tax returns for the years 1951 and 1952 with intent to evade tax. There is a deficiency in income tax for each of the years 1951 and 1952 due from petitioners, part of which is due to fraud with intent to evade tax. Opinion The first issue that will be considered in this case is whether petitioners' income tax returns for the years 1950, 1951, and 1952 were false and fraudulent with intent to evade tax. It appears from the record that on March 24, 1959, when the deficiency notice in this case was issued, the time within which the respondent might make an assessment of tax for the year 1950 had not expired because of consents executed by petitioners and respondent extending the period within which such assessment might be made until June 30, 1959, and petitioner does not contend to the contrary. From the evidence, it appears that for the years 1951 and 1952, the period within which the respondent might make an assessment had expired on March 24, 1959, when the notice of deficiency *60 was issued unless the period of limitation provided in section 275(a) of the Internal Revenue Code of 1939 was inapplicable under the provisions of section 276(a) of the Internal Revenue Code of 1939 which provides that in the case of a false and fraudulent return with intent to evade tax, the tax may be assessed at any time. Petitioners alleged in their petition that the deficiencies for 1951 and 1952 were barred by the statute of limitations. The only defense to this allegation in respondent's answer is that petitioners' returns for these years were false and fraudulent with intent to evade tax. The only evidence in this case with respect to the year 1950 tending to show affirmatively any omission of income from petitioners' original income tax return is with respect to the amount of $1,218.02 shown to have been received by petitioners from the Golden West Salvage Company in that year. Since only gross profits were shown in petitioners' original return for 1950, it is not clear that this amount was not included in the income reported on their income tax return. The evidence affirmatively shows that no payments under the name, "H. Jackson," appear from the records of Alpert produced *61 at the trial as having been made in 1950. The first sales slip produced under this name was one dated in January 1951, and the only witness who testified with respect to payments to petitioner on slips made in the name of H. Jackson did not herself make any such payments until March 8, 1951. In fact, the evidence shows that this witness was away from Alpert's from August 20, 1950, until February 20, 1951. The evidence creates some suspicion that there was a knowing and intentional omission of income from petitioners' 1950 income tax return, but suspicions cannot substitute for the clear and convincing evidence required to prove that a taxpayer filed a false and fraudulent return with intent to evade tax. We have, therefore, found as an ultimate fact and so hold that petitioners did not file a false and fraudulent income tax return for 1950. The evidence with respect to the years 1951 and 1952 is clear and convincing that petitioner failed to report substantial amounts of income received. The testimony of the witness, Brody, supported by records of Alpert produced at the trial, was clear that payments in substantial amounts were made to petitioner on weight slips made out in the name *62 of H. Jackson. The evidence that the witness, Brody, rewrote original weight slips to place some under the name of S. Hershey and others under the name of H. Jackson and destroyed some original weight slips discredits her testimony that the sole reason for making some slips under the name of H. Jackson was to accommodate petitioner. The evidence also shows other transactions between petitioner and Brody which tend to discredit her testimony that she received no personal benefit and Alpert received no benefit from rewriting of any of these weight slips. However, after considering this evidence, we are convinced that her testimony with respect to the payments of large amounts of cash to petitioner on weight slips listed in the name of H. Jackson is true. This testimony of Brody is supported by other clear and convincing evidence in the record. It is supported by the amended returns for 1951 and 1952, signed and filed by the petitioners on January 12, 1954, in which petitioner listed receipts in the amounts of $67,568.14 and $55,409.83, respectively, under the name of H. Jackson. It is supported by the testimony of the certified public accountant who made out petitioners' amended returns *63 for 1951 and 1952 that petitioner stated to him that he had income in those years which was not reported and that in those years he was doing business under the name of H. Jackson. The evidence is equally clear that the gross receipts from the sale of scrap metals as shown on petitioners' original returns did not include any amounts petitioner received in cash on weight slips made out in the name of H. Jackson. While the evidence is not equally as clear that the entire amounts shown on the H. Jackson slips constituted additional income to petitioner, the evidence is completely clear and convincing that a very substantial portion of these amounts did constitute additional income to petitioner. We are also convinced from the evidence that omission of such sizeable amounts from income could not have been an oversight on the part of petitioner but was with a willful intent to evade income tax on such receipts. Cf. M. Rea Gano 19 B.T.A. 518 (1930). Respondent places considerable stress on the fact that petitioner did not testify at the trial in an effort to refute the testimony of the witnesses called by respondent to establish that petitioners' returns were false and *64 fraudulent and that there was some deficiency in tax for the years 1951 and 1952 which was in part due to fraud with intent to evade tax. We have not considered the failure of petitioner to testify in arriving at our conclusion that petitioners' returns for the years 1951 and 1952 were false and fraudulent with intent to evade tax and that there are deficiencies in these years due in part to fraud with intent to evade tax, since the evidence in the record is clear and convincing. We have considered petitioner's conviction on a plea of nolo contendere in 1951 only as a part of the general background of the case. Cf. Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F. 2d 240 (C.A. 5, 1955). We have found as an ultimate fact, and so hold, that petitioners' income tax returns for the years 1951 and 1952 were false and fraudulent with intent to evade tax and that there are deficiencies in those years due in part to fraud with intent to evade tax. For the year 1950 the burden is upon petitioners to establish error in respondent's determination of the deficiencies asserted in the notice of deficiency. Petitioners argue with respect to the year 1950 that respondent's *65 determination was arbitrary and for this reason it is not incumbent upon them to show the correct amount of deficiency but that this burden rests upon respondent. We have set forth in some detail the method used by respondent to compute the deficiency for 1950 and the lack of cooperation he received from petitioner in this undertaking. We think that respondent's method of computing the deficiency for 1950 was reasonable in view of these circumstances and since there is no evidence in the record showing error in respondent's determination for 1950, we sustain the deficiency as determined by him for that year. Respondent has failed, however, to show that any part of this deficiency for 1950 was due to fraud with intent to evade tax. Petitioners argue that respondent not only has the burden for 1951 and 1952 to show that their returns for those years were false and fraudulent and that there was some deficiency a part of which was due to fraud with intent to evade tax, but also contend that respondent has the burden to show the amount of the tax since his determination was arbitrary. Once respondent has established that petitioners' returns were false and fraudulent and that there *66 were deficiencies a part of which was due to fraud with intent to evade tax, it is incumbent upon petitioners to show error in respondent's determination of deficiencies. Estate of W. Y. Brame, 25 T.C. 824, 831 (1956), affirmed per curiam 256 F. 2d 343 (C.A. 5, 1958). Cf. Avery v. Commissioner, 22 F. 2d 6 (C.A. 5, 1927), affirming 5 B.T.A. 872 (1926). If a taxpayer shows that the Commissioner's determination is arbitrary and invalid, then he is not required to show the correct amount of tax due. Helvering v. Taylor, 293 U.S. 507 (1935). However, where there is no showing that the Commissioner's determination is arbitrary, since a taxpayer has the burden of proof, only such adjustments in the Commissioner's determination as he shows to be in error are properly made. Petitioners in the instant case argue that they have shown that respondent's determination was arbitrary and invalid. We do not agree. The evidence shows that an internal revenue agent and a special agent obtained from records of Alpert and Golden West Salvage Company information as to payments made to petitioner and that they obtained from records of *67 petitioner's suppliers amounts paid by petitioner for the scrap metals he sold. The evidence shows that petitioner was not cooperative in assisting the agents in their investigation in that he did not furnish the agents with the names of all the persons from whom he obtained scrap and did not inform the agents of any sales to Golden West Salvage Company. The agents obtained their information as to suppliers other than those names given to them by petitioner from notations on records at Alpert. The evidence shows that petitioner informed the agents that he had no books of account. If in fact the books petitioner produced at the trial were books kept in the ordinary course of business by petitioner, which is not shown by the evidence to be a fact, their existence was not disclosed to respondent until shortly before the trial. Under these circumstances respondent cannot be said to have been arbitrary in failing to use these books in making his determination. The manner in which respondent obtained the information as to receipts and cost of goods was a completely reasonable approach to a computation of income with the limited information furnished to respondent by petitioner. We, therefore, *68 hold that respondent's computation is not arbitrary and the burden is upon petitioner to show to what extent his income is less than that as determined by respondent. Petitioner relies to a large extent in his argument that respondent's determination is arbitrary on the net worth statement which was prepared by one of respondent's agents during the course of his examination of petitioner's returns which shows by a determination of increase in net worth during each of the years 1950, 1951, and 1952, plus estimated living expenses, that petitioner's estimated income as so computed was only $2,938.68, $4,862.10, and $2,080.04 for the years 1950, 1951, and 1952, respectively, in excess of the income as reported by petitioners on their original income tax returns for those years. On this statement is written: The figures set forth above are true and correct to the best of my knowledge. S. S. Hershey Subscribed & sworn before me this 30th day of November 1953. Martin D. Lipman. There is also a notation on this net worth statement as follows: In 1951 Mr. Hershey purchased an interest in The California Duplicating Co., Inc., for $10,000.00. The money used in this transaction *69 was borrowed as explained in the accompanying report. Since the inclusion of this would result in a contra entry it was not done. The evidence in the record made at the trial shows that in fact petitioner borrowed the money for investment in California Duplicating Company in 1952 and that by the end of 1952 substantial repayment of this loan had been made. There was also testimony by Brody that at one point in 1952 petitioner asked her to keep for him, and she did for a few days keep for him, $95,000 cash. The net worth statement does not contain any asset of cash. While, as petitioners contend, there have been numerous instances in which respondent's computation of a taxpayer's income on the basis of increase in net worth plus estimated living expenses, has been sustained as reasonable, respondent may use other methods of computing a taxpayer's income where such sources are available to him. Cf. George M. Still, Inc., 19 T.C. 1072 (1953), affirmed per curiam 218 F. 2d 639 (C.A. 2, 1955). For the years 1951 and 1952, petitioner contends both that he did not receive the full amount of receipts which respondent has included in his income and that his *70 costs of scrap metals were greater than respondent has shown. Petitioners contend that the amounts represented by the price adjustments of 1 or 1 1/2 cents a pound on aluminum borings were reported by them in 1951 as commissions earned due to sale of material on exclusive sales arrangement in the amount of $3,048.60 and for the year 1952 as commissions earned (cost of sales refund on exclusive material sales arrangement) in the amount of $11,270.64. Under respondent's method of determining business income as adjusted and subtracting therefrom business income as reported on the original return he has not duplicated an inclusion of these amounts even if they were a part of petitioner's gross receipts from Alpert since these amounts were reported on petitioners' income tax return as part of business income. The evidence shows that in the year 1952 petitioner made a payment of cash to Brody of $3,000 consisting of one payment of $2,500 and one payment of $500 which was listed by her as part of "our share" from California Duplicating Company. This cash payment appears to be in addition to regular payments made by petitioner of one-half of the salary which he drew from California Duplicating *71 Company. The record is not completely clear as to the nature of this item. However, the books produced at the trial show cost of purchases from California Duplicating Company in the amounts of $132.60 for 1951 and $2,608.80 for 1952 made by cash which were not included in respondent's computation of cost of sales. Petitioner's next argument is in connection with the crediting of amounts shown on the H. Jackson slips against loan accounts on Alpert's books shown as made to petitioner. The evidence does show that these loans were repaid by petitioner to some extent with credits from slips made in the name of H. Jackson. However, the evidence is reasonably clear that the money advanced on loans to petitioner in 1951 and 1952 other than the two $25,000 loans where the checks were made to Aircraft Tapered Sheets, was for his own use, and, therefore, the crediting of amounts from the H. Jackson slips for the repayment of these loans was in effect a payment of this amount to petitioner. It, therefore, does not appear that there is any error in respondent's determination for failure to give recognition to these credits. Petitioner contends that costs of sales are grossly understated in *72 respondent's computation and that the computation of such costs on the basis of five-sevenths of sales price is a fair and reasonable basis and should be accepted in lieu of respondent's specific computation. Petitioner argues that respondent's computation does not completely include all amounts which petitioner paid to obtain metals for which he received payment under the name of S. Hershey and that it does not include any amount paid for metals listed on slips under the name of H. Jackson. Petitioner relies upon the books that were produced at the trial to show an understatement for items shown on the weight slips under the name, "S. Hershey" of approximately $8,000 in 1951 and $20,000 in 1952. These books can be checked with respondent's computation with reasonable accuracy except as to amounts listed thereon as payments in cash and part of the amounts shown as payments by credit to the loans made by petitioner with the checks issued to Aircraft Tapered Sheets and to some extent, the difference between respondent's computation of cost and that on the books produced by petitioner at the trial with respect to payments on this loan is a difference in years of application of such payments. *73 We believe the evidence reasonably supports that petitioner made payments in cash that were not included by respondent in his computation of cost of goods sold of approximately the amounts shown in the books produced at the trial. On the basis of the evidence as a whole we find that petitioner's cost of sales is as shown in these books which is $32,321.12 for 1951 and $92,029.55 for 1952. The evidence fails to show any further omitted costs in respondent's determination. In fact the evidence indicates that petitioner, prior to December 1952, was obtaining some scrap metals from National Tapered Wings, Inc., for which he made no payment except the service of hauling. There is no evidence of any payment made for scrap metals listed on H. Jackson slips except for such credits as may have been applied on the Aircraft Tapered Sheets advance for which full credit is given by accepting the amounts shown on the books produced at the trial. Except for the adjustments set out above, we sustain the deficiencies as determined by respondent and also sustain the additions to the tax under section 293(b) of the Internal Revenue Code of 1939 for the years 1951 and 1952 since a part of the deficiency *74 for each of these years was due to fraud with intent to evade tax, and we sustain the addition to tax for 1950 determined by respondent under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure of proof by petitioners that such addition is not due. The additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1951 and 1952, recomputed on the income for these years as determined herein, are also sustained for failure of proof on the part of petitioners that such additions to the tax are not due. Decision will be entered under Rule 50.